UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  S1-4:21 CR 333-5 SEP (JMB) |
| | ) | |
| SAMUEL AYE, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Currently before the Court are Defendant Samuel Aye's Motion to Suppress Evidence [ECF No. 155] and Motion to Suppress Statements [ECF No. 156].  The government opposes the motions.  Pretrial motions were referred to the undersigned United States Magistrate Judge.  See 28 U.S.C. § 636(b).

**INTRODUCTION AND PROCEDURAL BACKGROUND**

Samuel Aye is charged by indictment with a drug trafficking conspiracy.  On December 27, 2022, Aye filed the pending suppression motions.  The government filed responses in opposition on January 10, 2023.  On Aye's request, the Court continued the evidentiary hearing until March 9, 2023.  Aye and counsel Zachary Borowiak appeared for the hearing; AUSA Angie Danis appeared for the government.  At the outset of the hearing, the undersigned advised the parties that the issues raised in Aye's Motion to Suppress Evidence [ECF No. 155] could be resolved upon review of the "four-corners" of the search warrants and applications at issue. Regarding Aye's Motion to Suppress Statements [ECF No. 156], the government presented testimony through one witness, St. Louis Metropolitan Police Department Detective David

Rudolph.  [ECF No. 185]  The government also introduced the following exhibits:  a DVD recording of police interactions with Samuel Aye while in police custody on August 14, 2021 (Gov't Exh. 1); a transcript of the DVD recording (Gov't Exh. 1a); a search warrant for records associated with a T-Mobile account for the number 314-827-2904 (Gov't Exh. 2); a search warrant for a black and silver LG cellular telephone phone having the number 314-827-2904 (Gov't Exh. 3); and a search warrant for a blue and black Motorola cellular phone (Gov't Exh. 4).  [ECF No. 186]  At the conclusion of the hearing, the Court directed the parties to file post-hearing memoranda.  The parties have filed their memoranda [ECF Nos. 216, 219] and the matter is ready for disposition.

Based on the testimony and evidence from the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witness and to review the recording of Aye's police interview, having reviewed the search warrant documents submitted, and having fully considered parties' arguments and written submissions, the undersigned makes the following findings of fact, conclusions of law, and recommendations.

### FINDINGS OF FACT

David Rudolph is a homicide detective with the St. Louis Metropolitan Police Department ("SLMPD").  Det. Rudolph has been an SLMPD officer since 2005, and a detective since about 2009.  As discussed below, in May and August of 2021, Det. Rudolph was involved in the investigation of the shooting death of a person named Obbie Shaw.

As reflected in Gov't Exh. 2, on May 20, 2021, Det. Rudolph applied for a search warrant to obtain records from T-Mobile relating to a cell phone having the number 314-827-2904.  The Application was made in the Circuit Court for the City of St. Louis, Missouri.  The Application requested records in the custody of T-Mobile, including location information, subscriber

information, call detail, and other records for the time period covering May 1, 2021, through May 17, 2021.  In support of the Application, Det. Rudolph submitted a sworn Affidavit.  A more thorough discussion of the Affidavit is included in the discussion of the issues below.  The Affidavit summarized the investigation of the murder of Obbie Shaw and how investigators became aware of the T-Mobile cellular account at issue and its connection to Aye.  A judge in the City of St. Louis issued a Search Warrant directing T-Mobile to produce the requested records. The various documents were signed by Det. Rudolph and the issuing judge at 9:15 a.m.[1]

As reflected in Gov't Exh. 3, on May 20, 2021, Det. Rudolph also applied for a warrant to search a black and silver LG cellular telephone with the number 314-827-2904 (the same number as the T-Mobile account).  The Application was made in the Circuit Court for the City of St. Louis, Missouri.  The Application requested information located on the LG cellular telephone.  In support of the Application, Det. Rudolph submitted a sworn Affidavit.  This Affidavit was substantially similar to the T-Mobile Affidavit; it summarized the investigation of the murder of Obbie Shaw and explained how investigators came into possession of the LG cellular telephone at issue.  The judge issued a Search Warrant authorizing the police to search the LG cellular telephone relative to murder and related crimes.  The Application and Affidavit were signed by Det. Rudolph and the issuing judge at 9:15 a.m.  The Search Warrant does not include a time.[2]

As reflected in Gov't Exh. 4, on August 25, 2021, SLMPD Det. Steven Saito applied for a

---

[1] The Application and Search Warrant both reflect an issue date of May 20, 2021, but the Affidavit lists the date as May 20, 2020.  Inasmuch as the facts alleged in the Affidavit refer to matters occurring in May 2021, it is manifest that the reference to 2020, instead of 2021, reflects a typographical error.

[2] The Application and Search Warrant both reflect an issue date of May 20, 2020, but the Affidavit lists the date as May 20, 2021.  The reference to 2020, instead of 2021, appears to  reflect a typographical error.

warrant to search a blue and black Motorola cellular telephone seized during Samuel Aye's arrest on August 24, 2021.  The Application was made in the Circuit Court for the City of St. Louis, Missouri.  The Application requested authority to search the Motorola cellular telephone.  In support of the Application, Det. Saito submitted a sworn Affidavit.  A more thorough discussion of the allegations in the Affidavit is provided below.  The Affidavit summarized an arrest of Aye on August 24, 2021, and how investigators came into possession of the Motorola cellular telephone.  The judge issued a Search Warrant authorizing the search of the Motorola cellular telephone relative to the felony crimes of unlawful possession of a firearm and possession of a controlled substance.  The Application and Affidavit were signed by Det. Saito and the issuing judge at 11:25 a.m.

At the evidentiary hearing on Aye's Motion to Suppress Statements, Det. Rudolph testified regarding his interactions with Aye following Aye's arrest on August 24, 2021.  Det. Rudolph testified that Aye was a suspect in the murder of Obbie Shaw, which occurred in May 2021.  Det. Rudolph represented that he asked the SLMPD Intelligence Division to locate and arrest Aye due to the Shaw murder and because Aye had other outstanding warrants, including  a felony warrant.

The circumstances of Aye's arrest were not developed in any detail at the evidentiary hearing.  Det. Saito's Affidavit in support of a search warrant, reflected in Gov't Exh. 4 (referenced above), represents that the investigators learned that Aye was residing at an apartment on Schirmer Street with a person named Rachel Pinnon.  On August 24, 2021, detectives arrested Aye at the Schirmer Street apartment.  Det. Saito's Affidavit further represents that he conveyed Aye to the Homicide Division of the SLMPD Headquarters.  While conveying Aye, Det. Saito advised Aye of his <u>Miranda</u> rights, and he questioned Aye about suspected narcotics and a cell phone found in the apartment.

As reflected in Det. Rudolph's testimony, as well as Gov't Exhs. 1 and 1a,[3] Aye was placed in an interview room at about 7:37 a.m. on August 24, 2021. Almost immediately Aye spontaneously stated "I thought this case was over with, man. It was self-defense, man. Got caught in the cross fire, man." (Gov't Exh. 1a at 2) Aye was restrained by his left wrist and provided water. The restraint was placed on Aye's wrist at his request to accommodate nerve/swelling issues. In the video, Aye does not appear to be in any substantial discomfort resulting from the restraint or his physical situation.

At about 10:22 a.m., Det. Rudolph and Det. Donald Thurman entered the room to interview Aye. Det. Thurman provided <u>Miranda</u> warnings to Aye. Aye answered a few basic pedigree-type questions but then unequivocally indicated that he did not want to speak with the detectives and that he wanted an attorney. The interview was terminated.

After Aye requested an attorney, Det. Rudolph advised Aye of the charges and turned his attention to the booking process. Det. Rudolph told Aye that he intended to present the matter to federal authorities.

Detective Rudolph left the interview room at about 10:24 a.m. At about 10:42 a.m., Det. Rudolph returned and asked Aye about his medical conditions and then left again. At about 10:51, Det. Rudolph re-entered the room and placed a wristband on Aye's right wrist and again left.

At about 10:54 a.m., Det. Rudolph returned to the interview room with booking paperwork. He explained to Aye that he had field booking sheets for the outstanding warrant and for a murder

---

[3] Government's Exhibit 1a is a transcript of the video recording of the Aye's interview at SLMPD Headquarters on August 24, 2021. At the evidentiary hearing, Det. Rudolph testified that the transcript accurately reflects the recording of Aye's interview. The undersigned has fully considered the video recording and is citing the transcript for convenience and ease of reference.

case.[4]  Det. Rudolph testified that the booking process generally involves asking questions and completing forms concerning pedigree, medical conditions, and property.  The video shows that Det. Rudolph confirmed Aye's date of birth, Social Security Number, medications, and emergency contact information.

During this booking process, Aye asked Det. Rudolph how many drug charges he had and whether there was a federal charge.  Det. Rudolph responded that there was only one drug charge, and he noted the date of the warrant and that it was for the City of St. Louis.  Aye appeared cogent and lucid throughout this process.

According to Det. Rudolph, the booking process requires the suspect to sign in a few places.  The video shows that Aye was fine with signing in some places but not in others.  For example, it appears that he was comfortable signing to confirm his name.  When Det. Rudolph presented Aye with a form reflecting the items seized, which included a gun, Aye asked "what am I signing for there?  You never tell me nothing about a gun or a cell phone."  (Gov't Exh. 1a at 13-14)  Det. Rudolph told Aye that those were items seized from Aye, to which Aye responded, "You didn't get nothing from me."  (Id. at 14)  The video shows that Det. Rudolph explained that the gun came from the basement of the apartment where Aye was arrested, and that, by signing, Aye was not admitting any guilt, but rather reflecting that the police took certain items.  Aye responded that he did not have any guns.  In response to that statement, Det. Rudolph stated,

> Well, the gun we got out of your apartment is the same gun I got on video of you walking out of Heavy's house with, which I would have explained it all to you in here had you allowed me to talk to you.  I got you on video leaving Heavy's house.  You know he has that surveillance camera?

---

[4] At the evidentiary hearing, Det. Rudolph explained that he used two different booking sheets because the arresting division was "stat-driven," suggesting that two booking sheets would result in two arrest statistics.

(Id. at 14)  The undersigned finds that Det. Rudolph's question regarding surveillance Heavy's house was not a routine booking question and this interaction prompted an exchange between Det. Rudolph that goes to the heart of Aye's Motion to Suppress Statements  Therefore, the details of that exchange will be discussed further in the analysis below.

Detective Rudolph left the room and then returned to fingerprint Aye.  Thereafter, he returned with Det. Thurmond, and the detectives  interviewed Aye extensively.

Additional findings of fact are included in the discussion and analysis of the issues.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATIONS

**I.    Motion to Suppress Evidence** [ECF No. 155]

Aye asks the Court to suppress evidence seized pursuant to three search warrants issued in the Circuit Court for the City of St. Louis, MO.  In particular, Ayes challenges:  the May 20, 2021, warrant for historical records from T-Mobile associated with telephone number 314-827-2904 (Gov't Exh. 2; the "T-Mobile warrant"); the May 20, 2021, warrant to search the black and silver LG cellular telephone having the number 314-827-2904 (Gov't Exh. 3; the "LG cell phone warrant"); and the August 25, 2021, warrant to search the blue and black Motorola cellular telephone seized on August 24, 2021 (Gov't Exh 4; the "Motorola cell phone warrant").

Aye contends that the affidavits for the warrants in question lacked probable cause and fail to establish a nexus between Aye's cell phones and evidence of a crime.  Accordingly, he asks the Court to suppress all evidence seized pursuant to the three warrants, as well as any evidence later derived therefrom.  In his post-hearing brief, Aye also notes that the affidavits for the T-Mobile and LG warrants fail to state whether Aye shot Obbie Shaw, and that the affidavits allege that Ladainian Ewing confessed to shooting Shaw.  Aye further asks the Court to consider that the T-Mobile and LG warrant affidavits never state that the LG cell phone was with Aye at the time of

the Obbie Shaw shooting or somehow used in connection with that shooting.

The government counters that each of the affidavits supplies sufficient probable cause, and even if they are found lacking, no evidence should be suppressed because the good faith exception to the exclusionary rule applies.

### A.    <u>Legal Principles</u>

"The Fourth Amendment requires that search warrants be issued only upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." <u>Dalia v. United States</u>, 441 U.S. 238, 255 (1979) (internal quotations omitted).  In this case, the government applied for and obtained search warrants.

The "[i]ssuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place." <u>United States v. Faulkner</u>, 826 F.3d 1139, 1144 (8th Cir. 2016) (citing <u>United States v. Rodriguez</u>, 711 F.3d 928, 936 (8th Cir. 2013)); <u>see also</u> <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); <u>United States v. Keys</u>, 721 F.3d 512, 518 (8th Cir. 2013); Fed. R. Crim. P. 41.  Probable cause is "a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules."  <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983).  "Probable cause may be found in hearsay statements from reliable persons, <u>Gates</u>, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, <u>McDonald v. United States</u>, 335 U.S. 451, 454 (1948).  While these are some of the ways in which probable cause is commonly established, they are by no means all-inclusive."  <u>United States v. Jones</u>, 2019 WL 7331747 at *3 (E.D. Mo. Nov. 19, 2019).

It is well-established that, when the issuing judge relies on the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (citations and quotations omitted); see also United States v. Farlee, 757 F.3d 810, 819 (8th Cir. 2014); United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995). In this case, each search warrant indicates that the issuing judge found probable cause based on the affidavit submitted with the search warrant application. Aye does not contend that any affidavit included false or misleading information, or that any affidavit omitted any important information. Therefore, the Court will address Aye's challenges by considering the allegations included within the "four-corners" of the affidavits. See Solomon, 432 F.3d at 827.

When assessing probable cause for the issuance of a warrant, "a reviewing court … [pays] great deference to the probable cause determination of the issuing judge or magistrate, and [the] inquiry is limited to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed." United States v. Daigle, 947 F.3d 1076, 1081 (8th Cir. 2020) (citations and quotations omitted; emphasis supplied); see also Gates, 462 U.S. at 236; United States v. Green, 954 F.3d 1119, 1123 (8th Cir.) ("We owe great deference to the issuing court's probable-cause determination.") (citation omitted), cert. denied, 141 S. Ct. 597 (2020). Under this deferential standard, "[t]he affidavit should be examined under a common sense approach and not in a hypertechnical fashion." Solomon, 432 F.3d at 827 (citation and quotations omitted); see also United States v. Ventresca, 380 U.S. 102, 109 (1965).

Finally, there must also be evidence of a nexus between the place or thing to be searched and the crime. Nexus is "determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence" in the place or thing to be searched. United States v. Colbert,

828 F.3d 718, 726 (8th Cir. 2016) (citation omitted). Nexus need not be specifically recited in an affidavit and application for a search warrant. Rather, "[j]udges are entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." United States v. Petruk, 929 F.3d 952, 961 (8th Cir. 2019) (citation omitted); see also United States v. Randle, 39 F.4th 533, 536-37 (8th Cir. 2022).

**B.** **Warrant for T-Mobile Phone Records Associated with # 314-827-2904**
(Gov't Exh 2)

Detective Rudolph's affidavit for the T-Mobile warrant alleges that, at 11:52 a.m. on May 16, 2021, the SLMPD Homicide Division, was requested to the area of 813 Schirmer St., relative to a deceased male shooting victim. The affidavit identified the victim as Obbie Shaw. The affidavit represents that officers in the SLMPD First District received at least one call for shots fired in that area at approximately 2134 hours on May 15, 2021. The affidavit represents that Det. Rudolph received information concerning the shooting from a confidential source ("CS"). The affidavit describes the source's information as follows:

> In summary, the CS advised that Shaw had recently stolen drugs from a subject who the CS identified by the nickname "Man". According to the CS, "Man" frequently sells drugs at the apartment complex where the incident occurred, and he also has family members who live there. When "Man" saw Shaw at the apartment complex, an altercation occurred which resulted in Shaw being killed. The "CS" advised that "Man" was also shot during the incident and was transported by private conveyance to Cardinal Glennon Children's Hospital for treatment. The CS advised that "Man's" first name is possibly Samuel.

(Gov't Exh. 2 at 5) The affidavit represents that investigators "had received prior vague information which indicated that another individual involved in this incident had been shot and was at a hospital," and that an "[i]nvestigation into recent Aggravated Assault reports produced complaint number 21-020172. During this incident, Samuel Aye [pedigree provided] was dropped off at Cardinal Glennon Children's Hospital by a white Chevrolet Malibu bearing Missouri license

plate XD5P0B.  The occupants left the hospital after conveying Aye." (Id.)  According to the affidavit, Aye was moved to Saint Louis University Hospital where he told the police that he was robbed earlier on May 15, 2021, but he did not report that robbery to the police, and that he was shot later while walking near South Grand Blvd. and Arsenal St.  He also told the police that his nephew Anthony Clark took him to the hospital.

The affidavit next explains that a computer inquiry of a system referred to as CrimeMATRIX linked Aye to a person connected to the 806 Schirmer St. address.

The affidavit represents that, on May 17, 2021, detectives interviewed Aye at the hospital. Aye provided information "generally similar" to what he provided in complaint no. 2-1020172, and that he told detectives that he had been robbed of his Android cell phone with the number 314-827-2904, and that the shooting was separate from the robbery.  Aye told detectives that Anthony conveyed him to the hospital, and that Anthony happened to find him lying on the ground.

The affidavit next explains how the Chevrolet Malibu that was used to take Aye to the hospital was connected to Tiffany Clark, who had utilities at 2001 Westfield Court, Apt. D., Maplewood, MO.  On May 17, 2021, detectives located the Malibu near 2001 Westfield Court. Detectives went to 2001 Westfield Court, Apt. D., and met with Tiffany Clark, Anthony Clark, and Ladainian Ewing.  The affidavit represents that the detectives conducted a consent search of the apartment and recovered, among other things, two firearms, heroin, currency, and the black and silver LG cellular telephone (with the number 314-827-2904) which Aye said had been stolen. Ewing was taken into custody and interviewed.  According to the affidavit, "Ewing admitted to firing a rifle at Shaw after Shaw and Aye began exchanging gunfire over a dispute about stolen drugs." (Gov't Exh. 2 at 7)

Based on the allegations in Detective Rudolph's affidavit for the T-Mobile warrant, the

undersigned finds that the issuing judge had a substantial basis to find probable cause. See Daigle, 947 F.3d at 1081. Although the affidavit relies on information from a confidential source, that information was sufficiently corroborated by independent investigation to render the information reliable.[5] For example, the CS reported that someone with the nickname "Man" and Obbie Shaw had an altercation over drugs and that both were shot, and that "Man" was transported to Cardinal Glennon Children's Hospital for treatment. The CS also reported that "Man's" first name was possibly Samuel. The affidavit describes how investigators corroborated some key facts, including that a person named Samuel Aye was shot and taken to Cardinal Glennon Children's Hospital. The affidavit describes that Aye told the investigators that his cell phone was stolen, yet the police found that phone during a consent search of an apartment associated with the people who took Aye to the hospital after he was shot. And a computer inquiry connected Aye to a person who lived in the vicinity of the Obbie Shaw shooting.

Aye also argues that Det. Rudolph's affidavit fails "to establish a nexus between [Aye's] cellular phone, phone records and evidence of a crime." (Defendant's Motion to Suppress Evidence, ECF No. 155 at 6) The undersigned finds that a substantial nexus can be inferred from the facts alleged in the affidavit. In particular, the affidavit alleges sufficient facts for the issuing judge to conclude that: (1) Aye sold drugs in the area and Aye was involved in an altercation with Obbie Shaw over drugs; (2) Obbie Shaw was shot and killed by someone during that altercation;

---

[5] See United States v. Reed, 25 F.4th 567, 569-70 (8th Cir. 2022) (noting that the core issue regarding confidential sources is the reliability of information) (citing United States v. Evans, 4 F.4th 633, 637 (8th Cir. 2021)); see also Petruk, 929 F.3d at 959 (explaining that "[i]t is well-established that [t]he statements of a reliable confidential informant are themselves sufficient to support probable cause for a search warrant") (citation and quotation omitted). One of the ways of demonstrating reliability is by corroboration. See United States v. Knutson, 967 F.3d 754, 759 (8th Cir. 2020) (citation omitted). "[T]he fact that [the] corroborated details [are] not about criminal activity does not subtract from the probable cause analysis." Faulkner, 826 F.3d at 1145 (citation omitted).

(3) Aye was shot in relation to that altercation; (4) a computer inquiry connected Aye to the area of the shooting; (5) Aye was taken to the hospital by someone associated with 2001 Westfield Court, Apt. D.; and (6) Aye told the police his cell phone was stolen but that cell phone that was recovered from the apartment at 2001 Westfield Court where heroin and firearms were also found. It was, therefore, reasonable to conclude that evidence, including historical location information, would be stored relative to the records associated with that cell phone.

It is not fatal or concerning that Det. Rudolph's affidavit did not affirmatively allege that Aye had the LG cell phone at the time of the Obbie Shaw altercation. See Daigle, 947 F.3d at 1081 (explaining that a reviewing court is to assess the adequacy of the affidavit on the basis of "what it does contain, not what it on lacks, or on what a critic might say should have been added") (citation and quotations omitted). It is a fair inference that Aye possessed the LG cell phone because the affidavit reflects that Aye provided the number to the investigators when he was interviewed at the hospital, and Aye said the phone had been stolen, yet it was recovered from the apartment of people associated with the vehicle that took Aye to the hospital following the shooting. Thus, the reasonable inference is that Aye lied to the police when he said his cell phone was stolen earlier that day. It was also reasonable to conclude that the location information associated with the LG cell phone would be relevant to the Obbie Shaw murder investigation. See United States v. James, 3 F.4th 1102, 1105-06 (8th Cir. 2021) ("As 'a practical and common-sens[e] standard,' probable cause leaves plenty of room to draw reasonable 'inferences' from less-than-perfect evidence.") (quoting Cronin v. Peterson, 982 F.3d 1187, 1197 (8th Cir. 2020)), cert. denied, 142 S. Ct. 1352 (2022). It does not matter whether Aye, Ladainian Ewing, or someone else actually shot Shaw, there was probable cause that the location and subscriber information associated with Aye's cell phone account would be relevant to the investigation of the Obbie Shaw

murder.[6]  For example, the location information would indicate if the user of the LG cell phone was in the vicinity of the shooting at the time of the altercation, and the movements of the cell phone's user before and after the shooting.  The subscriber information would provide, among other things, contact and call history information that could link the LG cell phone further to Aye and any contacts Aye may have had with Obbie Shaw before the shooting.

The undersigned finds that the T-Mobile search warrant was constitutionally sound.  But even if the affidavit was somehow lacking in probable cause, it was not so lacking as to render official reliance on the warrant unreasonable.  See United States v. Dickerman, 954 F.3d 1060, 1065 (8th Cir. 2020).  Therefore, assuming arguendo that the affidavit lacked probable cause, the good-faith exception to the exclusionary rule precludes suppression of the evidence seized pursuant to that warrant.[7]

For the foregoing reasons, the undersigned respectfully recommends that the Court deny Aye's motion to suppress evidence associated with the T-Mobile warrant (Gov't Exh. 2).

**C.** **Warrant for LG Cell Phone with # 314-827-2904**
(Gov't Exh 3)

Detective Rudolph was also the affiant for the warrant to search the LG cell phone with the

---

[6] The phone itself need not be an instrumentality of the shooting.  "In Warden v. Hayden, 387 U.S. 294 (1967), the Supreme Court did away with the distinction between mere evidence and instrumentalities, fruits or crime, or contraband."  United States v. Saddler, 19 F.4th 1035, 1039 (8th Cir. 2021) (internal quotations omitted).  "[I]n the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction."  Id. (quoting Hayden, 387 U.S. at 307).

[7] "Leon establishes that if an officer (1) obtains a search warrant (2) that appears properly issued on its face and (3) executes it within its scope and with objective good faith reliance on the warrant's validity, then a defect in the probable cause analysis undergirding that warrant will not cause evidence to be suppressed."  United States v. Eggerson, 999 F.3d 1121, 1124 (8th Cir. 2021) (citing United States v. Leon, 468 U.S. 897, 922 (1984)).

number 314-827-2904.  The allegations concerning probable cause and the investigation into the Obbie Shaw shooting included with the LG cell phone warrant are substantially the same as those in the affidavit for the T-Mobile warrant.  The LG warrant affidavit also includes information concerning cell phone forensic considerations.

For at least the same reasons that the T-Mobile warrant passes Fourth Amendment scrutiny, the undersigned concludes that the issuing judge had a substantial basis to find probable cause and issue the LG cell phone search warrant.  Therefore, the undersigned respectfully recommends that the Court deny Aye's motion to suppress evidence associated with the LG cell phone warrant (Gov't Exh. 3).[8]

### D.    Warrant for Motorola Cell Phone
(Gov't Exh 4)

The final warrant at issue involves a Motorola brand cell phone that was seized on August 24, 2021.  The warrant authorized the search of the Motorola cell phone relative to the felony offenses of unlawful possession of a firearm and possession of a controlled substance.  (Gov't Exh. 4 at 2)  Aye argues that the affidavit lacks a connection between the phone and criminal activity.

The affiant for the Motorola cell phone warrant was SLMPD Detective Steven Saito. According to the affidavit, Det. Saito worked in fugitive apprehension and was involved in locating and arresting Aye relative to a felony drug warrant that SLMPD Detective James Wilcox located on or about July 12, 2021.  The affidavit represents that the detectives were aware that Aye is a convicted felon and summarizes Aye's criminal history, which included drug-related convictions. According to the affidavit, Det. Wilcox learned that Aye was residing at 812 Schirmer St., Apt. B,

---

[8]  Even if the LG cell phone warrant affidavit was lacking in probable cause, it was not so lacking as to render reliance on the warrant unreasonable.  See Dickerman, 954 F.3d at 1065. Therefore, the good-faith exception to the exclusionary rule precludes suppression of the evidence seized pursuant to the LG cell phone warrant

with a woman named Rachel Pinnon.  The affidavit explains that Pinnon was the lease holder of the apartment, and that the utilities were listed in her name.  On August 24, 2021, the detectives located and arrested Aye at the 812 Schirmer St. apartment.  The officers cleared the apartment for safety purposes, and also obtained consent to search from Pinnon.  Det. Saito represented that he observed "a plastic bag containing suspected narcotics lying next to a cell phone on a bedside table in the rear bedroom in plain view."  (Gov't Exh. 4 at 4)  Det. Saito's affidavit also represents that Pinnon advised that Aye sometimes sleeps in the back bedroom when he does not sleep on the couch.  Pinnon further told the officers that Aye had at least one handgun which he sometimes stored in a basement common area, but she was unsure if he still had it because he was talking to a neighbor about selling it.  The affidavit explains that the officers found a pistol matching the description provided by Pinnon in the basement rafters.

Detective Saito's affidavit also explains that Aye was advised of his Miranda rights when he was being transported to SLMPD headquarters, and that Aye acknowledged that the cell phone seized belonged to him and stated the suspected narcotics were his pain medications.[9]  The affidavit further explains that Aye told Det. Saito that he occasionally carries a firearm for protection.

The affidavit includes a training and experience section in which Det. Saito states:

> Through training and experience, I am aware individuals involved in narcotics and illegal weapons transaction frequently utilize their cell phones to communicate.  I am aware individuals who are convicted felons cannot obtain firearms legally, and therefore must utilize other means to obtain firearms.  Frequently, this is done via the use of cellular phones through text messaging and other electronic communications.  I am aware this data is stored on cell phones.  I believe the requested authorization will reveal evidence of illegal weapons transactions and narcotics transactions.

---

[9] Although Aye filed a motion to suppress statements, which is addressed below, that motion only challenges the interrogation that occurred after he arrived at SLMPD Headquarters, not any statements he made while in transit.

(Gov't Exh. 4 at 5)

Although the affidavit it is arguably thin in some respects, our Court must "afford great deference to the issuing judge's probable-cause determination." Petruk, 929 F.3d at 959. The undersigned finds that the affidavit for the Motorola cell phone warrant provided "a substantial basis for concluding that probable cause existed" that evidence of gun and/or drug violations would be found on the phone. Daigle, 947 F.3d at 1081 (citations and quotations omitted); see also United States v. Mazulla, 932 F.3d 1091, 1098 (8th Cir. 2019) (explaining that a reviewing court "will not disturb a court's finding of probable cause [to issue a search warrant] unless there was no substantial basis for that finding") (citations and quotations omitted). The affidavit connected the phone to Aye, and it alleged that Aye had criminal history for drug offenses and an active warrant for a drug charge. The affidavit alleged that the officers located suspected narcotics at the residence and that Aye sometimes carried a firearm. These allegations, along with the remainder of the affidavit, were sufficient to support a conclusion that evidence of drug trafficking and firearms offenses would be found on Aye's cell phone. See Eggerson, 999 F.3d at 1127 ("It would be unreasonable and impractical to demand that judges evaluating probable cause must turn a blind eye to the virtual certainty that drug dealers use cell phones."); United States v. Crippen, 627 F.3d 1056, 1063 (8th Cir. 2010) (noting that "weapons and violence are frequently associated with drug transactions").

But even if Det. Saito's affidavit is lacking in probable cause, the undersigned finds that it was not so lacking as to render reliance on the warrant unreasonable, and the good-faith exception to the exclusionary rule precludes suppression of the evidence seized pursuant warrant.

### E.   Conclusion - Motion to Suppress Evidence

The three warrants in question are supported by probable cause and the officers executing

those warrants acted in good faith.  Therefore, the undersigned respectfully recommends that the Court deny Aye's Motion to Suppress Evidence [ECF No. 155].

## II.    <u>Motion to Suppress Statements</u> [ECF No. 156]

Aye also asks the Court to suppress statements he made to Det. Rudolph after he was taken to SLMPD Headquarters following his arrest on August 24, 2021.  In particular, Aye contends that, although he was provided <u>Miranda</u> warnings, he invoked his right to counsel but the police thereafter re-initiated questioning.  Therefore, he asks the Court to suppress any statements he made after he invoked his right to counsel.

For its part, the government does not dispute that Aye was in custody and that he invoked his right to counsel.  The government contends that Aye "continuously and repeatedly asked questions of Detective Rudolph about the investigation, including how and why he was being charged with various offenses, … [and that] Aye demanded to see certain pieces of evidence, then proceeded to ask questions about that evidence."  (Response to Motion to Suppress Statements, ECF No. 166 at 8)  Although Aye further refined his arguments after the motion hearing, the government elected not to elaborate or clarify its position in its post-hearing memorandum.

### A.    <u>Legal Principles</u>

Statements made to law enforcement officers during custodial interrogation are normally subject to the protections and procedures identified in <u>Miranda v. Arizona</u>, 384 U.S. 436, 477-78 (1966).  <u>See</u> <u>United States v. LeBrun</u>, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).  "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody …."  <u>Illinois v. Perkins</u>, 496 U.S. 292, 296 (1990) (citation and quotation omitted). <u>Miranda</u> warnings are required when a suspect is both in custody and subjected to official questioning.  <u>See</u> <u>LeBrun</u>, 363 F.3d at 720.

"Miranda thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." Edwards v. Arizona, 451 U.S. 477, 482 (1981). "If [the accused] requests counsel, 'the interrogation must cease until an attorney is present.'" Id. (quoting Miranda, 384 U.S. at 474). In Edwards, the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id. at 484. Therefore, where the accused has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police." Id. at 484-85.

**B.    Analysis**

There is no dispute that Aye was in custody and that he unequivocally invoked his right to counsel. The recording of his interview demonstrates that the detectives recognized that Aye had invoked his right to counsel. It is also not disputed that Aye was questioned further after he was booked. The dispositive issue in this case, therefore, is whether Aye or the police re-initiated questioning. The undersigned concludes that the police re-initiated questioning during the booking process, which would be a violation of the Edwards rule discussed above.

A summary of the facts of Edwards is instructive because there are similarities between that case and Aye's situation. In Edwards, the suspect invoked his right to counsel and interrogation ceased. The police met with him again the next day—not at his request—and readvised him of his Miranda rights. See Edwards, 451 U.S. at 487. The suspect agreed to talk, and "at his own request," he listened "to part of the taped statement made by one of his alleged accomplices and then made an incriminating statement." Id. On these facts, the Supreme Court

19

held that the suspect "was subjected to custodial interrogation [on that second day] within the meaning of Rhode Island v. Innis …,[10] and that this occurred at the insistence of the authorities." Id. Because the statements were made without counsel, they were ruled inadmissible.

The circumstances of Aye's interrogation are sufficiently similar to the situation in Edwards to warrant suppression. When the totality of the facts and circumstances are considered, the undersigned concludes that Det. Rudolph re-initiated interrogation during the booking process. A consideration of the sequence of events is necessary.

After Aye requested counsel, all interrogation ceased, and Det. Rudolph gathered some forms and began the booking process. At the outset of the booking process, Det. Rudolph advised Aye that he was booking Aye for a bench warrant and a murder charge, and that he would be using two separate booking sheets. Aye asked what the bench warrant related to and the two briefly discussed the source of the charge (but not the details), with Det. Rudolph confirming that Aye had an active state bench warrant for possession of a controlled substance.

Det. Rudolph then asked Aye for emergency contact information and to sign some paperwork. Aye asked Det. Rudolph what he was signing, and Det. Rudolph advised that it related to items seized from Aye's possession. Aye responded, "You didn't get nothing from me," and Det. Rudolph advised "Well, they … got the gun out of the basement of your house over at that apartment. You're not admitting that you're guilty. It's just saying we took these items." (Gov't

---

[10] By citing Rhode Island v. Innis, the Court in Edwards recognized that police interrogation can take forms other than express questioning. Rather, "properly understood, [interrogation] involves either 'express questioning or its functional equivalent.'" United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). "Accordingly, interrogation encompasses 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" Id. (quoting Innis, 446 U.S. at 301). Determining "[w]hether a particular statement constitutes an interrogation depends upon the circumstances of each case …." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005).

Exh. 1a at 14)  Aye stated, "Man, I didn't have any guns, man."  (<u>Id.</u>)  At this point the following

exchange occurred:

> **Detective Rudolph:**  Okay.  Well, the gun we got out of your apartment is the same gun I got on video of you walking out of Heavy's house with, which I would have explained it all to you in here had you allowed me to talk to you.
> I got you on video leaving Heavy's house.  You know he has that surveillance camera?
>
> **Mr. Aye:**  Yeah.
>
> **Detective Rudolph:**  Do you know that dummy backed up all of his surveillance video?
>
> **Mr. Aye:**  Hmm.
>
> **Detective Rudolph:**  So that gun we got out of the basement of that house –
>
> **Mr. Aye:**  No.  That's not mine.  I didn't –
>
> **Detective Rudolph:**  Well, why did you have it in your waistband?
>
> **Mr. Aye:**  In my waistband?  Man, I didn't have it –
>
> **Detective Rudolph:**  When you were leaving Heavy's house.
>
> **Mr. Aye:**  No, no.
>
> **Detective Rudolph:**  You want to show me the video?
>
> **Mr. Aye:**  Yeah.  Show me the video.
>
> **Detective Rudolph:**  Okay.  Let's get through this and I'll go get – I'll go get the video.  This is the second booking sheet.  These are for the other charges.
>
> **Mr. Aye:**  What –the other charges, murder and ACA?
>
> **Detective Rudolph:**  Um-hum.
>
> **Mr. Aye:**  I mean, how am I to get charged with murder, man?
>
> **Detective Rudolph:**  Do you want to talk to me about it?

**Mr. Aye:**  No man.[11]  I'm not going to sign that one.

**Detective Rudolph:**  You're not admitting you're guilty.  You're just saying that you are Samuel Aye, you didn't lie to me about your name.  That's all you are signing.
Look, I certify that all my personal information is correct.  I understand –

**Mr. Aye:**  I don't want to sign that one.

**Detective Rudolph:**  Okay.

**Mr. Aye:**  So what did – what's the grounds you booking me for murder?

**Detective Rudolph:**  Do you want to sign – do you want to sign for your prescription medication?

**Mr. Aye:**  Yeah.  Where's that?

**Detective Rudolph:**  Right here

**Mr. Aye:**  The grounds that you booking me for murder is that a gun you seen me with?

**Detective Rudolph:**  No.  I'll explain everything to you.  Do you want to see the video?

**Mr. Aye:**  Yeah.

**Detective Rudolph:**  Okay.  Well, you did ask for a lawyer.  Do you want to see the video or do you want a lawyer?

**Mr. Aye:**  You said you was going to let me see the video.

**Detective Rudolph:**  Okay.  That, and do you want to know what's going on with this murder charge, or do you want to –

**Mr. Aye:**  Yeah, I want to --

**Detective Rudolph:**  So you're willing to speak with me?

**Mr. Aye:**  Yeah.  Yeah, man.

---

[11] While the transcript might indicate that Aye was answering Det. Rudolph's inquiry about wanting to talk, the video reflects that, after Det. Rudolph asked if Aye wanted to talk about it, Aye focused on the form, and was most likely commenting about not wanting to sign the booking form relative to the murder charge.

**Detective Rudolph:** Okay. Hang tight.

(Gov't Exh. 1a at 14-17)  After this exchange, the booking process stopped except that the officers fingerprinted Aye.  The officers then showed Aye photographs and resumed questioning Aye.

The government argues it was Aye who re-initiated questioning.  The foregoing entirely refutes that position.  Although Aye initially asked questions concerning the bench warrant, he simply asked how many drug charges he had and whether there was a federal charge.  Those are questions related to routine booking matters and cannot fairly be construed as re-initiating any questioning; he did not ask about the factual basis of any charge.  To be sure, Aye eventually asked to see the video from Heavy's house, and he asked about the basis of a murder charge, but those inquires occurred after Det. Rudolph first spoke with Aye about evidence showing that Aye possessed a gun.  When Aye denied having a gun, Det. Rudolph engaged Aye with a series of questions and comments that were unrelated to routine booking questions.  For example, before Aye ever asked to see the video, Det. Rudolph asked Aye if he knew about the surveillance system at Heavy's house, and then asked why Aye had a gun in his waistband in the surveillance.  Det. Rudolph may have intended those initial questions and related comments about surveillance video as merely rhetorical matters, but the Court applies an objective standard.  See Edwards, 451 U.S. at 487; Innis, 446 U.S. at 301.

Critically, up until the point at which he was asked about a surveillance system at Heavy's house, Aye had not asked any questions that would reasonably be construed as seeking to initiate further communications or questioning with the investigators regarding the alleged offenses.  All he had done was ask what he was being charged with and deny having a gun when he was asked to sign for a gun that was seized from the basement of an apartment building where he was arrested.  At that point, Aye did not know about any surveillance video or other evidence the police had.

23

Thus, when Det. Rudolph asked Aye about the video and Aye's prior possession of a gun at Heavy's house, and when he said he would have explained this to Aye had Aye allowed him to do so, Det. Rudolph initiated questioning.  It does not matter that Aye eventually asked to see the video.  In fact, before Aye asked to see the video, the detective asked him, "You want me to show you the video?"  (Gov't Exh. 1a at 15)  In other words, Aye did not initiate the questioning and circumstances that resulted in his request to see the video and further discuss his case.  On these specific facts, pursuant to Innis, 446 U.S. at 300-01, a police officer should have reasonably understood that his questions and comments about observing Aye on surveillance video with a firearm while simultaneously booking him for a murder charge was likely to elicit an incriminating response from Aye.  Therefore, the undersigned finds that those questions and comments reflect that the police, not Aye, re-initiated questioning, which was contrary to the Edwards rule.  See Zephier, 989 F.3d at 633.

While there are some differences between Aye's interrogation and the circumstances in Edwards, the undersigned does not think those differences are legally relevant.  In Edwards, the police returned to the suspect a day later.  Here, there was little delay between the time when Aye invoked his right to counsel, and when the police asked Aye about the gun and the surveillance video.  The fact that less time passed weighs in favor of suppression, but overall Edwards directs that anything other than an extensive break in custody is not relevant; the focus is on who re-initiated the questioning, not when it resumed.  That would be especially true where there has been no break in a suspect's custody.[12]  Aye also argues that the police coerced him into waiving his

---

[12] In Maryland v. Shatzer, the Supreme Court explained that the rationale of the Edwards rule was to ensure any later waiver of the right to counsel was entirely the suspect's voluntary choice and not the result of any police pressure.  See 559 U.S. 98, 104-05 (2010).  In Shatzer, the Supreme Court held, however, that the Edwards rule does not apply if a break in custody of two weeks or longer occurs.  See id. at 111.

right to counsel when he was asked, "Do you want to see the video or do you want a lawyer?" (Gov't Exh. 1a at 16-17)  This argument has some merit,[13] but that take it or leave it question occurred after the police had already re-initiated the questioning by asking Aye about the surveillance video and the gun.

In making the forgoing findings and conclusions, the undersigned does not find that Det. Rudolph deliberately tricked or induced Aye into waving his right to counsel.  And to Det. Rudolph's credit, after Aye affirmatively stated that he wanted to see the video, he took steps to confirm that Aye no longer wanted a lawyer.  But the Edwards rule does not permit the police to re-initiate questioning of a person who remains in custody, even if they start with fresh Miranda warnings.  Edwards rests on an objective standard, so Det. Rudolph's subjective intent is not particularly relevant to the inquiry.  See Edwards, 451 U.S. at 487.

C.    **Conclusion – Motion to Suppress Statements**

In summary, the undersigned finds that Aye invoked his right to counsel and the police thereafter re-initiated questioning during the booking process by asking Aye questions about a gun and surveillance video that were not related to, or a necessary part of, completing the booking process.  Accordingly, the undersigned respectfully recommends that our Court suppress all statements Aye made after he initially invoked his right to counsel on August 24, 2021, at the SLMPD Police Headquarters.[14]

---

[13] The government did not to respond to this argument in its post-hearing memorandum.

[14] When Aye was initially brought into the interview room, prior to any questioning, he stated "I thought this case was over with, man.  It was self-defense, man.  Got caught in the cross fire, man…." (Gov't Exh. 1a at 2).  That statement was spontaneous and not made in response to interrogation.  Therefore, Miranda does not apply.  See United States v. Bailey, 831 F.3d 1035, 1038 (8th Cir. 2016) (citation omitted).

## RECOMMENDATIONS

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Court **DENY** Aye's Motion to Suppress Evidence [ECF No. 155].

**IT IS FURTHER RECOMMENDED** that the Court **GRANT** Aye's Motion to Suppress Statements [ECF No. 156] and suppress all statements Aye made after he invoked his right to counsel on August 24, 2021.

The parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Report and Recommendation unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require review by a District Court Judge. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990). See also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

Pretrial proceedings in this matter have concluded. This matter will be set for trial by further order of the court, before the Honorable Sarah E. Pitlyk, United States District Judge.

_____

JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this __5th__ Day of _June_, 2023